In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-06-126 CR


____________________



JAMES JONES a/k/a SQUIRE JAMES JONES, JR.


a/k/a DERRICK JOSEPH JONES a/k/a DERRICK JOSEPH, Appellant 



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 252nd District Court


Jefferson County, Texas


Trial Cause No. 84140






MEMORANDUM OPINION


 A jury convicted appellant, James Jones a/k/a Squire James Jones, Jr. a/k/a Derrick
Joseph Jones a/k/a Derrick Joseph ("Jones"), of the murder of Graffit Jones Winford and
assessed punishment at fifty years of confinement. In this appeal, Jones argues the trial court
reversibly erred by restricting his counsel's cross-examination of a State's witness during the
punishment phase and by permitting the Court's bailiff to testify during the punishment
phase. We affirm.

Background


 Shaquita Janise, Winford's widow, testified that at the time of Winford's death, she
and Winford had been separated for a month or two. During the separation, Janise began a
romantic relationship with Jones. Janise explained that she and Winford frequently argued,
and they sometimes had physical altercations. According to Janise, Winford often drank
heavily. Winford had been warned by Janise not to come to Janise's residence in the Maida
apartment complex. On one occasion, Winford broke Janise's sister's arm with a baseball
bat. Winford had threatened Janise on the phone, and Jones had heard Winford threaten
Janise.

 According to Janise, on April 8, 2001, she spent the day with her children and a co-worker. Janise's son, Graffit, Jr., was spending the day with Winford. On that date, Jones
called Janise and asked her to pick him up so he could eat with them. Janise picked up Jones
and brought him to her apartment. Janise explained that when Winford arrived to drop off
their son, Winford wanted to talk to her, but she refused. According to Janise, Winford
threatened her, but she did not see him with any type of weapon. Janise testified that Jones
and Winford got into an argument because Winford "didn't want [Jones] there with his
family."

 According to Janise, Winford then got into his car and started to leave the apartment
complex. As Winford was attempting to leave, he and Jones exchanged words. Janise saw
Jones raise his arm and point a gun at Winford, and she then heard a single "pop noise." 
Janise testified that Winford's car then "sped off and hit the ditch." Janise ran to Winford's
vehicle, opened the door, and found Winford slumped over toward the passenger side of the
car. Winford had no pulse, and Janise was unable to revive him. Janise did not see any
weapons in Winford's car or in his pockets. Janise further explained that to her knowledge,
her husband did not have a gun.

 Joyce McKinney testified that on April 8, 2001, she was traveling down Maida while
taking children home from her daycare center. McKinney observed a car traveling behind
her, and the car stopped in an alley. When McKinney backed up, the headlights of her car
were facing the stopped car. McKinney then observed someone come out of an apartment,
and the person began talking to the driver of the car. McKinney saw the person in the car
hand something to the person who was standing outside the car. McKinney testified, "They
went in the apartment, came back out. When they came back out, they had something dark
throw[n] across their hand but one hand in front of him. . . . When he got to the car window,
he made a step back and start[ed] firing." According to McKinney, the man fired a shot into
the car. McKinney heard more shots being fired, and as she looked into her mirror, she saw
the car into which shots had been fired approaching her van from behind. McKinney
explained, "There was no exchange of gunfire. There was only one person shooting." 
McKinney recalled hearing "at least three" shots. McKinney testified that she then saw the
car travel "straight into the ditch."

 Angela Griffin testified that in April of 2001, she was living at the Maida apartment
complex. Griffin testified that Janise was a good friend of hers, and she also knew Winford.
Griffin testified that on April 8, 2001, while she was with her family at the Maida apartments, 
she heard four or five noises that sounded like gunshots. After hearing the noises, Griffin
left her apartment and saw Janise standing at her door and Jones standing outside. Griffin
also saw Jones get into Derwin Maxey's vehicle, and the vehicle left the scene. Griffin
further observed Winford in a vehicle that was backing out of the complex, and the vehicle
ended up in the ditch. Griffin approached Winford's car and checked to see if Winford had
a pulse, but she found that he did not. When Griffin viewed the inside of Winford's vehicle,
she did not see any weapons. Griffin testified that before he left the scene, she overheard
Jones say, "He pulled a gun on me," but she did not know if Jones was "speaking of that day
that this incident happened or another day."

 Dr. Tommy Brown, a forensic pathologist for Jefferson County, testified that he
performed an autopsy on Winford's body. Dr. Brown found that Winford had three upper
abrasions of his right temple and a gunshot wound in his left back. Dr. Brown testified that
the gunshot wound to Winford's back caused his death. Dr. Brown also testified that a gun
is a deadly weapon, and he testified that Winford's death was caused by a gun.

 Tor Roy Russell testified that he has been Jones's friend for a number of years. In
April of 2001, Jones came to Russell's house to clean up, and he told Russell, "Well, man,
I shot a guy." According to Russell, Jones had some bags in his possession. When Russell
later examined the items (which included a bag of clothes and two shoe boxes) he found a
gun. Russell testified that Jones told him "he was already over at the girl's apartment. . . . 
And the guy came and dropped the baby off and they had words . . . and . . . after they had
words, the guy was reaching in his car as if he was getting something . . . to shoot him with
. . . because they had had a confrontation and he sa[id] . . . then he just shot him." Russell
eventually contacted Crime Stoppers, and he showed detectives what he had found among
Jones's belongings.

 Chris Davis, an identification technician with the Beaumont Police Department, 
testified that he was dispatched to the Maida apartments in April of 2001 to process the crime
scene. Davis marked and photographed the shell casings he found at the scene. Davis
testified that all of the shell casings were of the same caliber. According to Davis, there were
four bullet holes in the vehicle, and another bullet was lodged in the door frame. Davis was
also dispatched to the home of Tor Roy Russell to investigate whether the gun found at
Russell's residence was used to kill Winford. Davis testified that he also recovered live
rounds from the weapon, and the caliber of those rounds matched that of the shell casings
found at the crime scene. Davis did not locate any weapons in Winford's vehicle.

 Deputy Charles Fancey of the Jefferson County Crime Lab testified that he oversees
the ballistics lab. Deputy Fancey testified that he and another individual conducted ballistics
testing on the weapon recovered from Russell's residence, and he determined that the
markings on bullets fired from the recovered weapon matched the rounds found at the crime
scene.

 The jury found Jones guilty and proceeded to hear evidence on punishment. At the
beginning of the punishment phase, the State tendered all evidence from the guilt/innocence
phase, and the Court ruled, "It'll be admitted." The State introduced into evidence the pen
packet pertaining to Jones's prior conviction for possession of a controlled substance, as well
as exhibits showing that Jones had committed eleven prior misdemeanor offenses.

 The State called Rodney Winford, the brother of the victim, to testify. Rodney
testified that Winford enjoyed sports and liked to have fun while they were growing up
together. Rodney also testified that Winford and Janise had children, and that Winford loved
playing with his children. Rodney testified that Winford "was fun to be around, and he loved
to joke. If he was around you-all, he'd make you laugh, have fun. He was a person to
respect you." Rodney also testified that things had been rough for him, for Winford's
children, and Winford's entire family since Winford's death. Jones's counsel then began
cross-examining Rodney, as follows:


 Q. Mr. Winford, this is a pretty important case to us. 


 Was it fun and was it a joke when he broke the sister-in-law's arm with
a baseball bat?


 [Prosecutor]: Your Honor, I'm going to object to relevance.


 THE COURT: That's sustained.


 [Defense counsel]: Judge, he's testified he was fun to be around.


 THE COURT: It's sustained.


 Q. Was it fun when you took a gun away from him?


 [Prosecutor]: Again, object to relevance.


 THE COURT: That's sustained.


 Q. Your brother drank heavily, didn't he?


 [Prosecutor]: Object to relevance.


 THE COURT: Sustained.


 [Defense counsel]: No questions, Your Honor.


 The State also called Deputy Rodney Williams, the trial court's bailiff, to testify. The
following colloquy then occurred between defense counsel and the trial court:

 [Defense counsel]: We would object to Deputy Williams testifying because
he is the Court's official bailiff. The Court has instructed the jury that they
were in his care for the remainder of the trial, if there was anything to assist
them, he was the one to go to, which you say is his normal function. He is the
only person who has had direct contact with this jury . . . during deliberations. 
He is also the person who arranged the mechanism [for the] jurors' lunch to be
provided for them.

 We believe that the Court's normal and necessary comments to this witness
would unnecessarily bolster his credibility because of that and it would
severely outweigh any type of probative value of his testimony.


 THE COURT: And just for purposes of the record, the Court is the one that
provided lunch to the jury. And as these attorneys are very well aware, at any
time throughout a trial, this Court -- as we're having this record made, there's
three bailiffs that are now over this case that were nowhere present when we
started this case on Monday. It's come to practice that we swap bailiffs around
at times. Therefore, your objection is denied.


Deputy Williams testified that during the guilt/innocence phase of the trial, while Jones was
changing his clothes, Jones "told us that he was going to do whatever it took to get out of his
criminal case and he was going to do whatever it took to escape." Deputy Williams
explained that Jones's statement concerned him, so the Court heightened its security
measures. Deputy Williams testified that he recalled Jones saying "I'll do whatever it takes
to get out of my case and to escape."

 Jones's father, Squire Jones, Sr., testified that Jones was funny and jovial while he
was growing up, and he did not have any behavioral problems. According to Squire, Jones
had many friends and was respectful to people. Squire testified that Jones excelled in both
academics and athletics, and he had never known Jones to be violent. Squire explained that
Jones began having problems after he lost his mother, and that the loss "altered his ability in
making correct decisions, which was unfortunate." Squire testified that Jones had begun
hallucinating, and Jones was prescribed drugs for psychological problems while he was
incarcerated.

 Psychiatrist Dr. Edward Gripon testified that he has evaluated Jones's competency to
stand trial approximately six times over a period of five years. Dr. Gripon described Jones's
condition as follows:

 He's had a tendency to wax and wane, meaning get worse and get better at
times. He's been aggressively treated on a number of occasions; and he is
currently well-compensated, meaning I think his condition is much better than
certainly at times when I've seen him. But he is also on a substantial amount
of what we call psychoactive medications, medications that affect the nervous
system. He takes a lot of medication, and he does have a significant mental
illness.


Dr. Gripon testified that Jones suffers from schizoaffective disorder, and he indicated that
Jones has "exaggerated or malingered some of his symptoms at times[.]" However, Dr.
Gripon emphasized that Jones does suffer from mental illness, and he opined that Jones
would deteriorate if he did not continue to take his medication.

 Jones testified, "I'm not a killer. I was forced to do this because [Winford] pulled the
gun on me." Jones further explained, 

 Mr. Winford pulled the gun on me because he was upset and frustrated
because the girl told him that she wanted me in her children's life. He had no
jurisdiction telling me when I leave or when I come there. He had a trespass
citation. He beat her with a bat. This guy was furious. He was angry. He was
angry because I took his children from him. I can understand that. But that's
no reason to pull a gun on someone and try and kill them. So, I defended
myself rightly.

Jones testified that he was merely trying to prevent Winford from killing him, and he "wasn't
aiming to kill [Winford]." Jones testified that he believes he is a visionary, and is not
mentally ill. Jones testified that Janise and Griffin removed Winford's weapon from his
vehicle before the police arrived.

Issue One


 In his first issue, Jones argues the trial court reversibly erred when it "limited the
cross-examination of a critical State's witness during the punishment phase." Specifically,
Jones complains that the trial court sustained each of the State's objections during his cross-examination of Winford's brother, thereby prohibiting Jones "from challenging the State's
evidence that the deceased was simply a wonderful man."

 The constitutional right of confrontation includes the right to cross-examine the
State's witnesses. Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). "[A]
defendant must be given wide latitude to explore a witness's story, to test the witness's
perceptions and memory, and to impeach his or her credibility." Cooper v. State, 95 S.W.3d
488, 492 (Tex. App.--Houston [1st Dist.] 2002, pet. ref'd) (citing Gutierrez v. State, 764
S.W.2d 796, 799 (Tex. Crim. App. 1989)). However, the trial court retains wide latitude to
impose reasonable limits on cross-examination to prevent harassment, prejudice, confusion
of the issues, harm to the witness, and repetitive or marginally relevant interrogation. 
Carroll, 916 S.W.2d at 498 (citing Delaware v. Van Arsdall, 475 U.S. 673, 682, 106 S.Ct.
1431, 89 L.Ed.2d 674 (1986)). We review the trial court's decision to limit cross-examination under an abuse of discretion standard. See Carroll, 916 S.W.2d at 498; Love
v. State, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993) (en banc).

 During the guilt/innocence phase, the jury heard evidence that Janise and Winford
sometimes had physical confrontations. The jury also heard evidence that Winford broke
Janise's sister's arm with a baseball bat, and that Winford had been warned to stay away from
Janise's apartment. The jury also heard evidence that Winford often drank heavily. Rodney
only testified during the punishment phase, and the substance of his testimony concerned
Winford's character and personality. The questions defense counsel asked Rodney regarding
Winford breaking his sister-in-law's arm and Winford's propensity to drink were cumulative
of evidence that had been admitted during guilt/innocence. See Tex. R. Evid. 403 (Evidence
may be excluded if its probative value is substantially outweighed by the needless
presentation of cumulative evidence.). The only proferred question that might have elicited
non-cumulative testimony concerned whether Winford's brother once had to take a gun away
from Winford on another occasion. (1) Defense counsel's proferred question sought evidence
to rebut Rodney's testimony that Winford was a fun person, not to show another pertinent
fact, such as Jones's assertion that he acted in self-defense. See Tex. R. Evid. 404(a)(2) (An
accused may offer evidence of a pertinent character trait of the victim.); Torres v. State, 71
S.W.3d 758, 760-62 (Tex. Crim. App. 2002) (A defendant who asserts self-defense may
present evidence of a victim's violent character.). Whether Rodney took a gun away from
Jones on a prior occasion is an irrelevant, collateral matter; that is, such evidence does not
make the existence of any fact of consequence to the determination of Jones's punishment
more probable or less probable. See Tex. R. Evid. 401. The trial court did not abuse its
discretion by limiting the scope of defense counsel's cross-examination. We overrule issue
one.

Issue Two


 In his second issue, Jones argues the trial court reversibly erred by permitting the
Court's bailiff to testify during the punishment phase. As discussed above, Deputy Williams
testified that Jones had threatened to escape. (2) Jones's counsel objected on the grounds that
Deputy Williams's status as the trial court's bailiff (and the person in direct contact with the
jury) would bolster his credibility.


 Article 36.24 of the Texas Code of Criminal Procedure provides as follows: 

 The sheriff of the county shall furnish the court with a bailiff during the
trial of any case to attend the wants of the jury and to act under the direction
of the court. If the person furnished by the sheriff is to be called as a witness
in the case he may not serve as bailiff.


Tex. Code Crim. Proc. Ann. art. 36.24 (Vernon 2006). "When a bailiff does testify,
however, reversal is not automatically mandated; instead, we must determine whether there
has been a showing of harm or prejudice as a result of the bailiff's dual role." Walker v.
State, 2 S.W.3d 655, 658 (Tex. App.--Houston [14th Dist.] 1999, pet. ref'd) (citing Criado
v. State, 438 S.W.2d 557, 560 (Tex. Crim. App. 1968)); Reed v. State, 974 S.W.2d 838, 840
(Tex. App.--San Antonio 1998, pet. ref'd). In determining whether the appellant has
demonstrated prejudice, we must examine the particular facts of this case to determine what,
if any, impact the bailiff's testimony had on the jury. See Walker, 2 S.W.3d at 658. We must
assess the bailiff's association with the jury and the importance of his testimony. See Ex
parte Halford, 536 S.W.2d 230, 233 (Tex. Crim. App. 1976); Long v. State, 820 S.W.2d 888,
891 (Tex. App.--Houston [1st Dist.] 1991, pet. ref'd). Even if a bailiff was a key witness for
the state, if his contact with the jury was minimal and the jury was not in a position to ascribe
extra credibility to the bailiff because of his assistance to them, there are no grounds for
reversal. See Walker, 2 S.W.3d at 658-59 (citing Reed, 974 S.W.2d at 840; Silva v. State,
499 S.W.2d 147, 151 (Tex. Crim. App. 1973)).


 After the jury was seated, the trial judge introduced Deputy Williams and told the jury, 

 Whatever it is that you want that will make your stay here more comfortable,
that's what we want to do. [Deputy Williams] will be working with you
throughout this period. Anything that we can do to accommodate you in that
regard, get with [Deputy Williams]. 

 

 . . . .

 

 [Deputy Williams] will be the one that you'll deal with. He can't answer any
legal questions for you; but he can help you get to a telephone, he can help you
get a cup of coffee, he can help along those lines. 


The trial court also instructed the jury to talk to Deputy Williams to obtain work excuses. 
After Deputy Williams testified during the punishment phase, the trial court asked another
officer to serve as bailiff for the remainder of the trial. During closing arguments, the
prosecutor briefly mentioned Williams's testimony twice.

 In this case, Deputy Williams's testimony was very brief and confined to the issue of
Jones's threat to escape. Jones made the escape threat to Deputy Williams during trial;
therefore, the State could not have anticipated before trial the need to call Deputy Williams
as a witness. With the exception of Deputy Williams receiving three notes from the jury to
the trial judge during guilt/innocence deliberations, the record contains no evidence of
contact between Deputy Williams and the jury.

 In addition to Deputy Williams's testimony regarding Jones's escape threat, the jury
had before it evidence from multiple witnesses that Jones had fired at least four shots at
Winford while Winford was in his vehicle attempting to leave, as well as evidence that Jones
had been convicted of a prior felony offense and eleven prior misdemeanor offenses. The
jury also heard potentially mitigating evidence that Jones suffered from significant mental
illness, as well as Jones's testimony that he shot Winford in self-defense. The sentence Jones
received was in the middle of his range of punishment exposure for the offense. Deputy
Williams had minimal contact with the jury, and his testimony did not concern a key element
of the State's case. Therefore, on this record, we see nothing to suggest that Jones suffered
any prejudice or harm from Deputy Williams's testimony during the punishment phase. See
Ex parte Halford, 536 S.W.2d at 233; Long, 820 S.W.2d at 891. Accordingly, we overrule
issue two and affirm the trial court's judgment.

 AFFIRMED.




 ______________________________

 STEVE McKEITHEN

 Chief Justice



Submitted on March 8, 2007

Opinion Delivered May 9, 2007

Do Not Publish


Before McKeithen, C.J., Gaultney and Kreger, JJ. 
1. When Jones's counsel cross-examined Janise, counsel asked Janise whether
Winford's brother took his gun away from him on a prior occasion, Janise responded that her
husband did not have a gun.
2. The record reflects that during the trial, the trial court became aware that Jones had
threatened to escape, and the trial court instructed Jones outside the jury's presence to
conduct himself properly for the remainder of the trial.